**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KLIAHAH THOMPKINS,<br><br>              Plaintiff,<br><br>       v.<br><br>THE CHILDREN'S HOSPITAL OF PHILADELPHIA,<br><br>              Defendant. | CIVIL ACTION<br><br><br>Case No.<br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff, Kliahah Thompkins ("Thompkins" or "Plaintiff"), files this Complaint against The Children's Hospital of Philadelphia ("Defendant" or "CHOP"), seeking all available relief under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, as amended, on behalf of herself. The following allegations are based on personal knowledge as to Plaintiff's own conduct and are made on information and belief as to the acts of others.

**NATURE OF THE ACTION**

1.     This action pits Plaintiff—a Registered Nurse who rose to the challenges presented by the COVID-19 pandemic and who, until recently, worked in Defendant's "Special Delivery Unit" ("SDU") assisting in the care and delivery of sick and special needs babies—against CHOP—one of the largest and most prestigious children's hospital systems in the United States.

2.     As outlined below, this action pulls back the curtain and reveals some of the profit-driven motives that permeates America's hospital systems and the surgical callousness and ease with which one system—CHOP—exacted retribution against an employee who stood in its way.

3. Despite its non-profit status, CHOP is a multi-billion-dollar hospital system, having generated more than $5 Billion dollars in revenue in FY 2025.[1] It operates numerous world-class facilities in the Philadelphia region and is a pre-eminent children's hospital specializing in, among other things, "mothers carrying babies with known birth defects."[2] CHOP cares for those mothers and babies in its SDU.

4. The SDU "is the world's first birth facility in a pediatric hospital."[3] CHOP'S SDU team—of which Plaintiff served as an integral part—"is one of the most experienced in the world at delivering and caring for babies with serious and life-threatening birth defects," and "delivers the largest number of critically ill infants in the nation."[4]

5. Due to its size and resources, CHOP assures its patients that "this means that you and your newborn will be close by one another as you both receive the world's most advanced care."[5] However, upon information and belief, behind the scenes the SDU was experiencing a staffing shortage and, as a result, employees were being forced to take on additional roles, with no additional pay, in order to save CHOP money and increase its revenue. Plaintiff was one of those employees.

6. This is an action for disability discrimination, failure to accommodate, and retaliation, including the constructive discharge of Plaintiff's employment, in violation of the ADA arising out of CHOP's decision to force Plaintiff to take on "charge nurse" management duties in a high-stress environment for which she was ill-equipped nor trained to perform, was hired to

---

[1] *See* https://www.chop.edu/about-us/annual-report-of-our-financials/financial-summary-and-combined-balance-sheet (last accessed March 23, 2026).
[2] *See* https://www.chop.edu/centers-programs/garbose-family-special-delivery-unit (last accessed March 23, 2026).
[3] *Id.*
[4] *Id*.
[5] *Id*.

perform a different role and, because of her diagnosed disabilities, was unable to perform (including for safety reasons). When provided with proof of her disabilities and letters from her medical providers supporting her request to not be forced into taking on the charge nurse management duties, CHOP ignored her pleas, denied her request for a reasonable accommodation, and retaliated against her by constructively discharging her from employment. [6]

7.      While CHOP publicly touts that its nursing team has been awarded high honors— "CHOP's nursing team has been awarded Magnet Status for Nursing Excellence …, a designation inly 6% of hospitals nationwide have achieved—it is silent on the challenges and difficulties it imposes on those same nurses when forced (against their will) to fall into line and do as it says, even when, as Plaintiff alleges below, it engages in illegal behavior.

## THE PARTIES

*Kliahah Thompkins*

8.      Thompkins resides in Philadelphia, Pennsylvania. Between approximately September 2019 and December 4, 2025, Thompkins was employed by Defendant as a Registered Nurse in CHOP's SDU at its hospital in Philadelphia. Her job title was "Clinical Nurse – Special Delivery."

---

[6] CHOP is no stranger to litigation involving, as here, claims of disability discrimination. In the past 10 years alone, it has been sued approximately two-dozen times in federal court in Philadelphia by employees with, among other things, disabilities involving mental health. *See e.g.*, *Jones v. Children's Hospital of Philadelphia*, No. 2:25-cv-06040 (E.D. Pa.) (allegations that CHOP discriminated against employee with anxiety disorder); *Dillard v. Children's Hospital of Philadelphia*, No. 2:22-cv-03445 (E.D. Pa.) (same); *Kline v. Children's Hospital of Philadelphia*, No. 2:25-cv-02982 (E.D. Pa.) (allegations that CHOP discriminated against employee with post-traumatic stress disorder); *Allen v. Children's Hospital of Philadelphia*, No. 2:22-cv-04256 (E.D. Pa.) (allegations that CHOP discriminated against employee with bipolar disorder); *Reilly v. Children's Hospital of Philadelphia*, No. 2:24-cv-0639 (E.D. Pa.) (allegations that CHOP discriminated against employee with panic and anxiety disorders); *Narducci v. Children's Hospital of Philadelphia*, (allegations that CHOP discriminated against employee with attention deficit disorder, depression, and anxiety); *Perry v. The Children's Hospital of Philadelphia*, No. 2:21-cv-02796 (E.D. Pa.) (allegations that CHOP discriminated against employee with depression and anxiety).

9. Thompkins suffers from anxiety and depression and is a qualified employee with a disability within the meaning of the ADA.

*The Children's Hospital of Philadelphia*

10. The Children's Hospital of Philadelphia is a domestic non-profit corporation with its principal place of business located at 3401 Civic Center Boulevard, Philadelphia, Pennsylvania 19104-4319.

11. Upon information and belief, CHOP employed thousands of individuals, including Plaintiff, during the relevant time period. During FY 2025 alone, CHOP paid nearly $3 Billion in salaries, wages, and employee benefits to its employee force.[7]

12. During the relevant time period, Defendant employed managers, supervisors, agents, and employees who had the authority to—and did—make decisions concerning Plaintiff's employment, and who acted in the interests of CHOP.

13. CHOP is a covered entity for purposes of the ADA.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, and 42 U.S.C. § 12117.

15. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

16. Defendant is subject to personal jurisdiction in Pennsylvania.

17. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) since the events or omissions giving rise to the claims in this Complaint occurred within this District and because Plaintiff and Defendant both reside in this District.

---

[7] *Ibid* 1.

4

## ADMINISTRATIVE PROCEDURES

18. On February 11, 2026, Plaintiff dual filed a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Philadelphia Human Relations Commission ("PHRC"). On February 12, 2026, the EEOC issued Plaintiff a Notice of Right to Sue, authorizing this action. *See* Exhibit A.

19. Plaintiff must wait one year before her claims before the PHRC may be litigated in Court. At that time, Plaintiff intends to amend her Complaint to include claims under Philadelphia's Fair Practices Ordinance. Plaintiff's claims under federal and Philadelphia law are predicated on the same facts.

20. This action has been commenced with ninety (90) days of receipt of the Notice of Right to Sue. Accordingly, Plaintiff has fulfilled all conditions precedent to initiation of this lawsuit.

## GENERAL FACTUAL ALLEGATIONS

21. Nearly 40 years ago Congress recognized that "discrimination against individuals with disabilities persists in such [a] critical area[] as employment …" 42 U.S.C. § 12101(a). Acknowledging that "society has tended to isolate and segregate individuals with disabilities," Congress determined that that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society." *Id*.

22. Therefore, in order to combat discrimination in employment on the basis of a physical or mental disability, Congress passed the ADA, a sweeping piece of legislation that prohibits, among other things, private employers, such as CHOP, from discriminating against qualified individuals in job application procedures, hiring, firing, advancement, compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12117.

23.     Despite Congress's best efforts, however, the number of discrimination claims, or "charges," filed with the U.S. Equal Employment Opportunity Commission (or "EEOC") rose to more than 88,500 in fiscal year 2024, an approximately 9% increase over 2023. *See* EEOC Fiscal Year 2024 Annual Performance Report.[8] In fiscal year 2024 alone, nearly half (or 48) of all merit lawsuits filed by the EEOC involved allegations of disability discrimination in violation of the ADA. *Id.*

24.     In or around June 2021, Plaintiff was diagnosed with anxiety and depression which are disabilities that substantially limit one or more of her major life activities, including, but not limited to, thinking, concentrating, and interacting with others.

25.     Between September 2019 and 2023 Plaintiff was a full-time employee working for CHOP in a bed-side nursing role on a rotating shift schedule. In 2023, Ms. Thompkins was granted a permanent night-shift schedule with CHOP (again, in a bed-side nursing role).

26.     Around the same time, CHOP attempted to unilaterally change Plaintiff's job duties and force her to become a "charge nurse" with management responsibility for overseeing the SDU's nurses during her assigned shifts.

27.     CHOP describes a charge nurse as someone who "coordinates staffing in a unit, arranges patient assignments and is available 24 hours a day to help with any issues."[9]

28.     Plaintiff objected to CHOP's proposed changes and indicated to her supervisors and CHOP's Human Resources department that she was suffering from anxiety and depression and would not be able to perform the job duties of the new position.

---

[8] Located at https://www.eeoc.gov/2024-annual-performance-report, last accessed March 23, 2026.
[9] *See* https://www.chop.edu/who-youll-meet-during-your-sdu-stay (last accessed March 23, 2026).

29.     As CHOP was, or should have been, aware, the SDU was understaffed which already exacerbated Plaintiff's anxiety and depression.

30.     Plaintiff provided CHOP with written confirmation of her disabilities from her medical providers and, to the extent she was being forced to perform new job duties, requested that CHOP not do so because of her disabilities.

31.     Other nurses in the SDU were already performing the charge nurse role and there was no undue burden on CHOP—given its size and resources—to adequately staff the SDU and use existing and new staff members to perform the charge nurse duties. Tacitly acknowledging this, CHOP decided against changing Plaintiff's job duties in 2023.

32.     Notwithstanding this, two years later in October 2025 CHOP attempted again to unilaterally change Plaintiff's job duties and force her to take on the additional management responsibilities of the position of charge nurse.

33.     This time Plaintiff was advised, through her manager Taryn Freeman, that all nurses employed in the SDU were now expected to be charge nurses within a year.[10] However, upon information and belief, CHOP does not have such a written policy.[11]

34.     Rather, CHOP refused to provide adequate resources and funding to the SDU in order to reduce labor costs and increase revenue which, in turn, caused other nurses to be called in to work additional hours and led to Plaintiff being forced to take on additional job duties without receiving additional pay.[12]

---

[10] *See* https://www.chop.edu/clinical-staff/freeman-taryn-m (employee profile for Ms. Freeman confirming her position as a "nurse manager" in the SDU) (last accessed March 23, 2026).

[11] *See* Exhibit B (job descriptions for the "Clinical Nurse – Special Delivery" role in effect during Plaintiff's employment which make no mention of having to work as a charge nurse).

[12] CHOP's obsession with decreasing costs and increasing revenue is so great that it is amplified in its job descriptions for current and potential employees. *See* Ex. B (requiring, among other things, that employees demonstrate fiscal stewardship and "not incur incidental overtime," "understand[] the implications of the cost of staffing decisions," "[i]dentif[y] observed opportunities for cost savings," "conserve[] unit and organizational resources," and "assure[]

35.    Upon information and belief, the situation was so dire that SDU's nurse managers developed "creative staffing models" to prioritize "the order in which staff should be canceled" in the SDU in order to save money.

36.    This problem was manifested when, in or about October 2025, a nurse was called in to work at 3:00 a.m. "to cover charge" after another colleague left, a situation Manager Freeman indicated was avoidable because—despite her disabilities—Plaintiff was "present, working, and could have covered the role as a team player."

37.    Upon information and belief, CHOP could—and should—have scheduled existing nurses to perform the charge nurse role (as it had done already for several years during Plaintiff's employment). Or, given the staff shortages, it could have hired more full-time nurses to perform the charge nurse role. Or, it could have hired additional travel nurses. Or, it could have offered overtime compensation to other nurses to incentivize them to work additional hours. Yet, CHOP's creative staffing models and tight labor budgets did not allow for it.

38.    Instead, it tried to force the charge nurse role onto Plaintiff.

39.    Though CHOP was aware of her disabilities and that she could not perform the job duties of the charge nurse role, Plaintiff nevertheless submitted a request for a reasonable accommodation to CHOP in October 2025.

40.    Plaintiff had already indicated to CHOP that she could not "perform in the [charge nurse] role," that it was "unhealthy for my mental health," and she had "never been a charge nurse and really feel[s] uncomfortable with how CHOP keeps attempting to force me into this undesired role. My anxiety is now peaked once again …"

---

supplies are not wasted or misused."); *see also* Ex. C (currently advertised job position on CHOP''s careers page for a "Registered Nurse" position in the SDU which includes similar language).

41.     On October 30, 2025, Plaintiff submitted a formal request for a reasonable accommodation to CHOP and explained that she is:

> "[R]equesting reasonable accommodations for mental health and well being concerns, for which I am receiving treatment. I would like to maintain my status as a bedside staff, non-charge nurse capacity to ensure I continue contributing to my unit and effectively perform without the increasingly overwhelming stress of charge responsibilities."

42.     Plaintiff's request was supported by documentation from **two medical providers** who believed the role of charge nurse was would exacerbate her disabilities and increase Plaintiff's anxiety and cause undue mental distress.

43.     Plaintiff subsequently met with Manager Freeman and a representative of CHOP's Human Resources Department to discuss her request. However, they failed to meaningfully engage in the interactive process. Instead, Plaintiff was told that her request for a reasonable accommodation was denied.

44.     Thereafter, Plaintiff sought a formal review of the denial by CHOP's Human Resources Department.

45.     On November 24, 2025, CHOP notified Plaintiff that it was "unable to grant this request." CHOP explained that the reason for the denial was "the SDU is not eligible for the support of float staff to support the charge role and continuing to not complete this duty would cause an undue hardship." Defendant did not propose a reasonable alternative—beyond indicating that she could apply for another job at CHOP—nor explain how it would cause CHOP an undue hardship.

46.     CHOP's message was clear: it was cheaper and more convenient to force Plaintiff to perform the charge nurse role than it was to have other staff do it, notwithstanding Plaintiff's concern that it was not safe and that the charge nurse role was inconsistent with her disabilities.

47.     Given CHOP's size and resources, providing Plaintiff with a reasonable accommodation—*i.e.*, permitting her to continue in her existing role without being required to perform charge nurse management duties in light of her recognized disabilities—would not have created an undue burden on CHOP

48.     For example, CHOP's operations had not previously been affected by Plaintiff's disabilities, and Plaintiff had successfully performed her existing job duties for several years.

49.     Plaintiff subsequently was resigned to having to perform the charge nurse role and wrote to Manager Freeman to discuss how to transition into the role.

50.     Shortly after, and unbeknownst to Plaintiff, CHOP moved to terminate her employment and, in or about early Dember 2025, Plaintiff received notification through CHOP's workforce management system that a meeting was scheduled between her and Manager Freeman. Plaintiff was not told the reason for the meeting.

51.     However, Plaintiff subsequently learned that the purpose of the meeting—as reflected in the workforce management system—was to terminate her employment for "insubordination."

52.     It was a pre-text for discrimination and retaliation because of Plaintiff's disabilities and CHOP's refusal to permit Plaintiff to continue in the role for which she was hired.[13] She had outlived her usefulness and was now a burden.

---

[13] CHOP has a "Rules of Conduct" policy—Document ID # 5-2—which establishes rules and guidelines that outline attendance, conduct, and performance expectations for employees and discipline that could result from violations. CHOP utilizes progressive disciplinary actions, but notes that employees who fail "to carryout supervisory direction and/or instructions is considered insubordination" which is subject to either a final warning or termination. As written, though, the policy means that any employee who refuses to follow a supervisor's directive—even those that are illegal because of an individual's disability—will be terminated because they were "insubordinate."

10

53. Throughout her entire employment at CHOP, Plaintiff had not been disciplined, written-up, reprimanded, or counseled for engaging in any unprofessional conduct, let alone behavior considered to be insubordination.

54. To the contrary, Plaintiff was a stellar employee and consistently received favorable performance reviews from Manager Freeman:

- "Kliahah takes responsibility for her actions and ensures that her colleagues follow suit. She does well at keeping her patients informed about their health care needs and she escalates to the appropriate disciplines if additional resources are needed."

- "Kliahah exhibits compassion for her colleagues and patients at all times."
- "Kliahah is a strong contributor on the SDU and is well respected amongst her colleagues. She is dedicated to providing safe and compassionate bedside patient care. She pays attention to detail with cross checking orders which has served her well in identifying gaps in care."

- "Overall, Kliahah continues to be an asset to the SDU in the capacity of a committed, respectful, compassionate, and dedicated employee. She consistently provides excellence in nursing care and abides by the CHOP ICARE values that we are all committed to."

55. Plaintiff's colleagues also provided glowing feedback, including:

- "Kliahah is an exceptional nurse. She consistently gives compassionate care. She is a valuable member of our team and is always ready to help when needed."

- "She is a wonderful communicator and actively listens."

- "She always is part of the team and advocates for her patients. She works extremely well with others on the team."

- "Kliahah's clinical practice is top notch … If I was a patient on the SDU, I would request Kliahah."

56. Because of the intolerable working conditions created by CHOP—discrimination and now, retaliation because of her disabilities—and to avoid being blacklisted from future employment because of CHOP's false allegation that she was insubordinate, Plaintiff had no choice but to resign her employment with CHOP (as of December 4, 2025).

57. CHOP knowingly placed Plaintiff in a position that was incompatible with her disabilities.

58. CHOP refused to provide a reasonable accommodation to Plaintiff despite her repeated requests.

59. CHOP failed to engage in the interactive process in good faith.

60. CHOP subjected Plaintiff to increasing and on-going pressure to perform duties she could not safely perform.

61. CHOP blamed Plaintiff for not performing the charge nurse manager duties and indicated that she was not a "team player."

62. These conditions were objectively intolerable to a reasonable person in Plaintiff's position.

63. As a direct result, Plaintiff was constructively discharged.

64. Defendant's conduct was intentional, willful, and/or demonstrated reckless indifference to Plaintiff's rights.

65. As she had been throughout her employment, Plaintiff remained professional and courteous during the transition process and completed, among other things, an exit interview for CHOP.

66.    Her exit interview captured, in detail, the basis of her constructive discharge:

"My reasonable accommodation request to not be forced into the charge nurse position was denied. Even though I would have maintained my role as bedside nurse, preceptor, scheduling committee member and 1 of 2 remaining trained scrub RN's. I was very disheartened by this decision, especially with the large focus on mental health, well-being and safety within the institution…I witnessed our clinical supervisor step down from her hired position, into a staff/charge nurse role for "mental health" … without a reasonable accommodation request approval needed…I am immensely saddened that I had to make the decision to resign, but I felt there was no other safe choice."

67.    Plaintiff's colleagues were upset that she was forced to resign and disappointed that CHOP had not granted her request for a reasonable accommodation. As one doctor wrote to a senior CHOP supervisor:

"I have heard that our wonderful, dependable, universally loved night nurse Kliahah Thompkins is resigning over the issue of being made to become a charge nurse. I believe we went through this a year or two ago and she was allowed to stay on as a nurse without the mandate to become a charge nurse. I am confused why we are doing this again and why we would let such an experienced wonderful nurse go over this?

I have many nights on the SDU where there are multiple nurses … who are all charge nurses on the same shift … How is this benefiting the unit to lose her? Haven't we all agreed to focus on retention rather than recruitment?

**My recollection from the last time we went through this was that she even had documentation from her mental health provider supporting her not being made to do charge. People are given all sorts of accommodations for all sorts of things and this seems like an easy one to abide by.**

If we can please revisit and retain Kliahah that would be the way the providers would vote. She really is a great coworker and wonderful with patients. I am 100% sure the doctors and midwives all agree."

(emphasis added).

68.     Since leaving, CHOP has continued to retaliate against Plaintiff, including billing her for hundreds of dollars for a certification she received during her employment, and refusing to complete a skills survey requested by another hospital in connection with a job application she submitted.

69.     In short, this case is another in a list of disability discrimination claims against an institution which, ironically, touts itself as being at the forefront of helping sick and disabled babies.

**FIRST CAUSE OF ACTION**
**ADA: Disability Discrimination, 42 U.S.C. § 12112**

70.     Plaintiff realleges and incorporates by reference the above allegations.

71.     Plaintiff is a qualified individual with recognized disabilities—anxiety and depression—that substantially limit one or more of her major life activities (and has a record of such impairment) and is protected from employment discrimination in accordance with the provisions of the ADA.

72.     Defendant is a covered entity for purposes of the ADA and is subject to its anti-discrimination provisions.

73.     Defendant was aware of Plaintiff's disabilities in 2023 and, again, in 2025 when she submitted medical documentation indicating she was diagnosed with mental health disabilities and should not be forced to perform the charge nurse manager role.

74.     Notwithstanding this, Defendant discriminated against Plaintiff by changing her job duties and forcing her to perform the role of the charge nurse manager even though it was not safe for her to do so and blamed her not being a "team player" because of her disabilities.

75.     Defendant knew that its adverse actions violated the ADA.

76.     Defendant's violation of the ADA was intentional, willful, and/or demonstrated

reckless indifference to Plaintiff's rights.

77.    As a result of Defendant's willful violations of the ADA, Plaintiff has suffered damages, in amounts to be determined at trial, and is entitled to recovery of such amounts, including for back pay and lost wages, front pay, emotional distress and mental anguish, humiliation, embarrassment, loss of benefits, attorneys' fees and costs, and punitive damages.

## SECOND CAUSE OF ACTION
### ADA: Failure to Accommodate, 42 U.S.C. § 12112

78.    Plaintiff realleges and incorporates by reference the above allegations.

79.    Plaintiff is an individual with a recognized disabilities and was able to perform the essential functions of her existing position (without a reasonable accommodation) and the essential functions of her the new charge nurse manager role with a reasonable accommodation.

80.    Plaintiff provided a medically supported accommodation request demonstrating that she should be permitted to remain in her current role and not be forced to perform the charge nurse manager role.

81.    Defendant denied the requested accommodation and failed to engage in good faith in the interactive process to identify and implement an effective reasonable accommodation.

82.    Defendant's failure to engage and failure to accommodate was deliberate and caused Plaintiff harm.

83.    As a result of Defendant's willful violations of the ADA, Plaintiff has suffered damages, in amounts to be determined at trial, and is entitled to recovery of such amounts, including for back pay and lost wages, front pay, emotional distress and mental anguish, humiliation, embarrassment, loss of benefits, attorneys' fees and costs, and punitive damages.

## THIRD CAUSE OF ACTION
### ADA: Retaliation, 42 U.S.C. § 12203

84.     Plaintiff realleges and incorporates by reference the above allegations.

85.     The ADA prohibits retaliation by a covered entity such as Defendant where an employee such as Plaintiff has opposed any act or practice that is unlawful under the ADA.

86.     Plaintiff engaged in protected activity by requesting a disability-related accommodation and by complaining to Defendant about disability-related discrimination.

87.     Defendant retaliated against Plaintiff because of that protected activity, including by denying her an accommodation, denying her other terms, conditions, and privileges of employment, and constructively discharging her from employment.

88.     Plaintiff alleges the protected activity was a but-for cause of Defendant's materially adverse actions.

89.     As a result of Defendant's willful violations of the ADA, Plaintiff has suffered damages, in amounts to be determined at trial, and is entitled to recovery of such amounts, including for back pay and lost wages, front pay, emotional distress and mental anguish, humiliation, embarrassment, loss of benefits, attorneys' fees and costs, and punitive damages.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

1.     Injunctive relief, including orders prohibiting further retaliation and requiring appropriate corrective measure;

2.     Back pay, lost compensation (including lost bonus and wage increases), and benefits;

3.     Compensatory damages, including for emotional distress, and mental anguish, humiliation, embarrassment, and related harms;

4.     Punitive damages as punishment and deterrence against the commission of future such conduct;

5. Reasonable attorneys' fees, expert fees where available, and costs;

6. Pre-judgment and post-judgment interest as allowed; and

7. Such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

Dated: March 23, 2026

<u>s/Jason Conway</u>
Jason Conway (PA # 317113)
**CONWAY LEGAL, LLC**
1700 Market Street, Suite 1005
Philadelphia, PA 19103
Telephone: (215) 278-4782
Fax: (215) 278-4807
jconway@conwaylegalpa.com

Daniel Levin, Esq. (PA # 80013)
Zanetta Moore-Driggers, Esq. (PA # 76609)
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone: (215) 592-1500
dlevin@lfsblaw.com
zmooredriggers@lfsblaw.com

***Attorneys for Plaintiff***